### CONE MILLS CORPORATION

v.

### A. G. ESTES, INC. and Dabbs Enterprises, Inc.

### Civ. A. No. 1129.

United States District Court, N. D. Georgia, Newnan Division.

March 28, 1975.

Sanders, Mottola, Haugen, Wood & Goodson, Newnan, Ga., for plaintiffs.

David G. Archer, Cartersville, Ga., for Dabbs Enterprises, Inc.

Ben R. Freeman, Greenville, Ga., for A. G. Estes, Inc.

## ORDER

ALBERT J. HENDERSON, Jr., District Judge.

This is a civil diversity action for breach of contract seeking, originally, a declaratory judgment, specific performance and injunctive relief. The plaintiff alleges that the defendant Dabbs Enterprises, Inc. (hereinafter referred to as "Dabbs"), entered into a contract with the defendant, A. G.

**940**

Estes, Inc. (hereinafter referred to as "Estes"), a cotton merchant, for the sale and future delivery of its 1973 cotton crop at a price of 12 cents per pound above the government loan value. Estes, in turn, contracted to sell that future crop to the plaintiff. However, some time after these transactions, but before the cotton crop reached maturity, a drastic, worldwide shortage of cotton fiber caused a multifold increase in the market price of raw cotton. In light of this change in market conditions, the defendant apparently became increasingly disenchanted with the substantially lower sale price of its 1973 crop. Subsequently, Dabbs gave notice to Estes of its intention to rescind the contract with Estes, claiming that it was invalid and unenforceable. Since the culmination of the sale and the delivery of the crop by Estes to the plaintiff was directly dependent upon the fulfillment by Dabbs of its agreement with Estes, the plaintiff brought this suit on October 10, 1973 seeking to specifically enforce the contract according to its express terms and to restrain Dabbs from selling the cotton to anyone other than the plaintiff.

Pursuant to a consent "Stipulation and Order" of October 26, 1973, together with the denial of Estes' motion to dismiss by order of November 16, 1973, a preliminary injunction issued directing Dabbs to specifically perform the contract with Estes. Estes was, in turn, directed to take delivery of the cotton, pay Dabbs the price specified in the contract and redeliver the cotton to the plaintiff in the manner contemplated by its respective contracts with Dabbs and the plaintiff. The plaintiff was required to post a letter of credit in the amount of $76,000.00 for damages which may be suffered by Dabbs in the event the Dabbs/Estes contract is finally determined to be invalid.

The defendant Dabbs then asserted, by way of crossclaim against Estes and counterclaim against the plaintiff, that since the plaintiff's equitable relief depends upon the validity of the purported contract between Dabbs and Estes both are bound "by the infirmities and deficiencies in said contract." Dabbs, in essence, contends that its contract with Estes for the future sale of cotton at "12 cents above loan" does not represent the true intent of the parties. While not attacking the validity of that contract on its face, Dabbs contends *inter alia*,[1] that it is unenforceable on the grounds of (1) fraud, (2) failure of consideration, (3) lack of mutuality and (4) unconscionability. Dabbs, therefore, seeks a declaratory judgment that the sales agreement is invalid, equitable relief in the nature of rescission and cancellation and damages against Estes and the plaintiff for the difference between the price specified in the Dabbs/Estes contract and the actual market value of the cotton at the time of its delivery in January, 1974.

In light of the ultimate disposition of the cotton under the preliminary injunction the only remaining claims for relief grow out of the counterclaim and crossclaim of Dabbs for declaratory relief and damages for its alleged injury caused because of the judicially mandated compliance with the purportedly invalid contract. The issues so joined between the plaintiff and the defendants came on for a trial before the court without a jury. Based upon the evidence adduced during the trial and the briefs and arguments of counsel, the court makes the following findings of fact and conclusions of law.

The defendant, Dabbs, is a business enterprise engaged, *inter alia*, in the growing and sale of cotton. It is incorporated under the laws of Georgia and has its principal place of business in Bartow County, Georgia. The defendant, Estes, is also a Georgia corporation, with its principal place of busi-

---

1. To the extent that Dabbs also alleges that the contract was invalid under Ga.Code Ann. § 20–602 and because it pertained to subject matter not in existence at the time of its execution, the counterclaim and crossclaim fail to state claims upon which relief may be granted for the reasons enumerated in the order of March 29, 1974.

ness in Meriwether County, Georgia. Pursuant to the prevailing practice in the industry, growers of cotton often enter into agreements with cotton merchants for the sale of all cotton to be produced in a given season on designated acreage of land. Since such contracts for sale generally arise early in the growing season, perhaps even before planting, the growers are then able to secure an early commitment for the purchase of their cotton at a fixed price and plan accordingly, although the actual sale is not consummated until delivery of the goods at a future time. Based upon these transactions with the growers, the merchant in turn contracts to sell the future cotton crops to processors and manufacturers.

By letter of March 21, 1973,[2] Estes authorized Cliff Smith to "act as our agent for the purchase of cotton crops in your area" subject to the condition that "[a]ll purchases made in our behalf by you as agent shall be on our standard cotton purchase contract form" and that "[p]rices and terms for all purchases are to be approved by A. G. Estes, Jr. [the president of Estes]. Cliff Smith managed a partnership under the name of "Smith Gin Company" in Cartersville, Georgia. Smith Gin Company was engaged in the farm equipment and machinery business, the ginning and processing of cotton and buying and selling of cotton on its own behalf. Since Smith was the only active partner in the company, he made no attempt to distinguish its affairs from his own personal dealings, insofar as is pertinent here. On prior occasions, he sold to Estes cotton he had previously purchased and represented Estes in purchasing cotton; however, 1973 was the first year in which he acted in the capacity of a purchasing agent for Estes

under a written authorization. Furthermore, in the various business endeavors of Smith Gin Company, Smith had for many years engaged in a satisfactory course of business dealings with Neal C. Dabbs, the president of Dabbs Enterprises, Inc., the vast majority of which were transactions founded only upon oral agreements.[3]

It is not clear whether Smith received a direct "commission" for his purchases on behalf of Estes, but he did receive a "per pound" amount from Estes for handling and loading cotton delivered from his gin to Estes' trucks. He also derived revenue directly from the contracting farmers in ginning and baling cotton sold to Estes through him. To facilitate the agency relationship, Smith was provided by Estes with a supply of "Sale and Purchase Agreement" forms to be used in purchasing cotton, which were previously executed by A. C. Estes, Jr. on behalf of Estes as the "Buyer" and otherwise incomplete as to the terms. This enabled Smith to make contracts for the purchase of cotton from growers by completing the form to comply with the terms of a particular sale. The price was, of course, subject to the approval of A. G. Estes, Jr. and Smith was kept regularly informed of the price he was authorized to offer growers for their cotton on Estes' behalf. Upon completion of the terms of the contract forms previously signed by A. G. Estes, Jr., the grower affixed his signature as the "Producer and Seller" of the cotton. The form contract states that:

> We, the Producer and Seller and the Buyer, have carefully read and fully understand the terms and provisions of the foregoing contract *which represents the entire agreement between the parties,* and understand further that there may be no modification of

---

2. See Exhibit A to "Stipulation of Testimony" of Arthur G. Estes, Jr.

3. In the counterclaim and crossclaim by Dabbs, it is acknowledged that "[a]s the primary ginner of the cotton grown by this defendant for many years; as bailer [sic]

for the cotton during and after it had been ginned; as the major supplier of farm equipment and supplies to this defendant; and as a close personal friend of Neal C. Dabbs, President of Dabbs Enterprises, Inc. . . . Cliff Smith occupied a confidential relationship with this defendant." ¶ 2.

this agreement except in writing. (emphasis added).

On April 10, 1973, Neal Dabbs and Smith negotiated the potential purchase by Estes of Dabbs' yet unplanted 1973 cotton crop. Smith expressed an interest in purchasing Dabbs' cotton on behalf of Estes at the price of twelve cents per pound above the government loan value, which the parties agree was the then prevailing fair market value for cotton of that type. Mr. Dabbs declined to sell at that price, but as a counterproposal offered to sell at a price of twelve and one-half cents per pound above loan value. Smith indicated that this figure was higher than he was authorized to pay and then telephoned A. G. Estes, Jr. at his office in Gay, Georgia, to inform him of Dabbs offer to sell at the higher price. Estes, however, refused to pay this price and instructed Smith to pay no more than twelve cents per pound on behalf of Estes. Estes then requested to talk with Dabbs over the telephone and during that conversation told Dabbs that twelve and one-half cents was "too high" and that Dabbs' demands were "killing me." Estes gave Dabbs no indication that he would be willing to pay more and, indeed, exhibited great reluctance to do so. Upon resuming his telephone conversion with Smith, Estes again emphasized that he would pay no more than twelve cents, but that if Smith wished to pay the extra half cent per pound, so as to meet Dabbs' demand, then that would be a matter of personal agreement between Smith and Dabbs. Estes made no mention, then or later, of executing an agreement to cover the additional half cent.

After the conversation with Estes, Smith returned to Dabbs and stated that "we" would give him the twelve and one-half cent per pound price on the cotton. He then proposed to draw up a contract on the Estes forms for sale of the cotton at the authorized price of twelve cents a pound, and then to contract separately to pay the additional half cent. This being acceptable to Dabbs, the Estes form was completed on April 10, 1973 to sell to Estes the "cotton produced by [Dabbs] during the crop year 1973 on approximately 480 acres situated in Bartow County, Ga." at the specified sales price of "12 cents above loan" to be delivered by "Jan. 20, 1974." [4] The evidence of the circumstances surrounding the execution of this contract compels the finding that the parties at that time contemplated that Smith and Smith Gin Company would be responsible for payment of the additional half cent. While it appears that they anticipated that Estes may later assent to the higher price and contract for the additional amount, the agreement was not conditioned upon that contingency. In the event Estes held fast to the twelve-cent price, as he in fact did, Smith stood ready upon delivery of the cotton by Dabbs to supplement the payment by Estes by the additional half cent. And, while Smith himself did not prepare an additional written contract to reflect the half cent increment, he and Dabbs had previously transacted business in an informal manner without written contracts. Since Dabbs' cotton would be processed in the Smith Gin Company before delivery to Estes, it was clearly in his interest to purchase that cotton for Estes even if he had to personally supplement the cost by the half cent. Admittedly, he "wanted to make the deal," and therefore personally undertook the full responsibility for payment of the amount above the sales price in the Dabbs/Estes contract upon delivery of the cotton. In the minds of both Dabbs and Smith, there was never a question of whether the extra amount would be paid or who was responsible for such payment, but merely who actually would ultimately pay it.

On the same date as the consummation of the sale to Estes, it, in turn, agreed orally to sell the same cotton to the plaintiff, a North Carolina corporation

---

4. Exhibit B to "Stipulation of Testimony" by Arthur G. Estes.

engaged in the manufacture of textile products. This contract for future sale of goods was confirmed by the plaintiff in writing on April 10, 1973, which was "accepted" by Estes on April 16, 1973.[5] The terms of this purchase were virtually identical to those specified in the Dabbs/Estes contract. The plaintiff had no knowledge of any purported irregularities in the Dabbs/Estes transaction until some time after August 20, 1974, when Dabbs gave notice to Estes of its intention to rescind.[6]

Pursuant to the preliminary injunction, the cotton was delivered to Estes and ultimately to the plaintiff and payment made in accordance with the terms of the written agreements. Although Smith tendered checks to Dabbs in satisfaction of his personal obligation to pay the half cent per pound above Estes' purchase price, Dabbs refused such payments, contending that it had no contractual relationship with Smith, but only the written agreement with Estes, through its agent, Smith, which it now contends is invalid.

All parties stipulate that the written contract between Dabbs and Estes is valid on its face. The contract to sell between Estes and the plaintiff is not directly in issue, but only to the extent that performance of it is dependent upon the enforceability of the Dabbs/Estes agreement. In now seeking to avoid the obligation to sell, Dabbs relies principally upon the argument that the "12 cents above loan" price in the written contract did not reflect the actual terms of the parol agreement with Smith for the purchase of the cotton at twelve and one-half cents per pound. Therefore, it asserts that it never intended to accept the offer of Estes to buy at twelve cents per pound and, in support of that contention, offered evidence of the alleged oral agreement made contemporaneously with the execution of the written contract. Neal Dabbs claims that he was induced to sign the instrument showing a sale price of "12 cents above loan" only because of the fraudulent misrepresentation of Smith, acting as Estes' agent, that Estes had authorized and approved the higher price and would later sign a written contract reflecting the orally agreed terms.

As a general rule, the express terms of a written contract, such as the one here, may not be materially varied by parol evidence of a prior agreement or of a contemporaneous oral agreement between the parties. Ga.Code Ann. § 38–501 and § 109A–2–202; Green, *The Georgia Law of Evidence,* § 199 (1957); *Romines v. Wagstaff Motor Company, Inc.,* 120 Ga.App. 608, 171 S.E.2d 752 (1969); *S. & S. Builders, Inc. v. Equitable Investment Corp.,* 219 Ga. 557, 134 S.E.2d 777 (1964). However, parol evidence is admissible to show that a written instrument, though valid on its face, was void because of fraud in its procurement. Ga.Code Ann. § 38–503; Green, *supra,* § 214; *Hinson v. Hinson,* 221 Ga. 291, 144 S.E.2d 381 (1965); *Johnson v. Sherrer,* 197 Ga. 392, 29 S.E.2d 581 (1944); *State Historical Association v. Silverman,* 6 Ga.App. 560, 65 S.E. 293 (1909). And, if the charge of fraud is substantiated, the written contract itself is voidable and subject to rescission at the election of the injured party. See Ga. Code Ann. §§ 20–502 and 109A–2–721.

The Georgia courts require precise allegations and particular proof of all the necessary elements of fraud. Green *supra,* § 214. These factors were recently enumerated in *American Food Services, Inc. v. Goldsmith,* 121 Ga.App. 686 at 688, 175 S.E.2d 57 at 59 (1970):

A defendant seeking damages [or rescission] by way of a counterclaim in

---

5. See Exhibit C to "Stipulation of Testimony" of Arthur G. Estes, Jr.

6. In light of the disposition of this case, there is no need to reach the plaintiff's contention that it was insulated from rescission because

of its purchase of the cotton crop at a time when Estes at least had "voidable title". See Ga.Code Ann. § 109A–2–403(1). However, it does not appear that Estes had any "title" prior to notice of rescission by Dabbs. See Ga.Code Ann. § 109A–2–401(2).

the nature of a tort claim for fraud and deceit must show (1) that the plaintiff (or someone acting for the plaintiff) made the representations; (2) that at the time they were known to be false (or what the law regards as the equivalent of knowledge); (3) the representations were for the intention and purpose of deceiving the defendant; (4) that the defendant relied on the representations; and (5) that the defendant sustained a loss or damage as the proximate result of the representations.

See also *Blanchard v. West,* 115 Ga.App. 814, 156 S.E.2d 164 (1967); *Brown v. Ragsdale Motor Co.,* 65 Ga.App. 727, 16 S.E.2d 176 (1941). Furthermore, actual fraud can only arise when the representations relate to then existing or past facts, and cannot be predicated upon statements which are merely promissory in nature referring to future acts or events. *S. & S. Builders, Inc. v. Equitable Investment Corporation, supra; American Food Services, Inc. v. Goldsmith, supra; Georgia Mobile Home Development Corp. v. Kuter,* 119 Ga.App. 781, 168 S.E.2d 858 (1969). However:

> [W]hen the failure to perform the promised act is coupled with the present intention not to perform, fraud, in the legal sense, is present. This is known as inceptive fraud, and is sufficient to support an action for cancellation of a written instrument.

*Hinson v. Hinson, supra,* 221 Ga. at 292, 144 S.E.2d at 383. See also *Nixon v. Brown,* 223 Ga. 579, 157 S.E.2d 20 (1967).

In viewing of the foregoing findings of fact, it is obvious that the inceptive fraud attack fails at the threshold since there were, in fact, no false representations made by Smith, as agent for Estes or otherwise, misleading Dabbs to his detriment. There were two separate and independent agreements made between Dabbs and Smith, one on behalf of Estes evidence by the written contract to purchase the cotton at "12 cents above loan," and the other in which Smith orally agreed to pay an additional half cent per pound himself or to obtain payment from Estes. In completing the written agreement with Dabbs on his principal's behalf, Smith used the presigned standard form contract and obtained the express oral approval of the terms by A. G. Estes, Jr. Thus, he acted entirely within the scope of his limited authority as a special purchasing agent for Estes. Upon execution by Dabbs, that written agreement was complete on its face and required no further affirmative acts of "acceptance" by Estes. Indeed, had the price of cotton dropped instead of risen, there is no question that Dabbs could, and surely would, have enforced the written contract of Estes to purchase at the specified price.

Under the ancillary oral agreement, Smith promised that Dabbs would receive in total the full price he requested of twelve and one-half cents above loan, either in part from him or in total from Estes. This was a mere "promise" of future performance by Smith, and no present intent on his part not to perform that obligation can be inferred from the evidence. Therefore, Smith did not misrepresent an existing state of facts with the intent to deceive Dabbs and to thereby fraudulently induce him to enter into the sales agreement with Estes. Based upon their prior dealings, Dabbs and Smith fully contemplated and expected that Smith would live up to this promise, whether or not it was ever reduced to writing. In fact, when the time came for delivery of the cotton, he tendered the additional amount to Dabbs.

Since the charge of fraudulent inducement is not supported by the evidence, the parties, including Dabbs, are bound by the express terms of the written contract, unless another pertinent exception to the application of the parol evidence rule obtains here.

It is clear from the foregoing discussion that the remaining contentions by Dabbs of want or failure of consideration lack of mutuality and unconscionability are without foundation, since they are all premised upon the allegation of fraudulent inducement. The written contract between Dabbs and Estes ·created mutually binding obligations to respectively sell and purchase at the admittedly fair market value of the cotton at the time the contract was executed. As the contract itself expressly noted that writing "represents the entire agreement between the parties." Such an agreement constitutes a complete contract to sell future goods enforceable under and subject to the provisions of Article II of the Uniform Commercial Code Ga.Code Ann. §§ 109A–2–101 *et seq.*, see §§ ˙109A–2–105 and 106.

Finally, Dabbs cannot escape operation of the rule under the "condition precedent" exception permitting parol evidence to show that the written agreement, though complete on its face, was contingent and not intended as a "presently operative embodiment of the entire agreement" between the contracting parties, *Hartman Stock Farm v. Henley*, 8 Ga.App. 255, 256, 68 S.E. 957 (1910). See also Green, *supra*, § 210. The entire obligation arising under the contract between Estes and Dabbs was for the purchase and sale of cotton at "12 cents" per pound, while the separate oral agreement called on Smith alone to supplement Estes' payment by an additional half-cent. This suit involves only the enforceability of the former agreement, and, on the basis of the foregoing findings and conclusions of law, the validity of that written contract between Dabbs and Estes must be upheld.

To the extent that any findings of fact set forth above are deemed to be conclusions of law or to the extent that any of the foregoing conclusions of law are deemed to be findings of fact the same shall be deemed conclusions of law or findings of fact, as the case may be.

Accordingly, the written instruments representing the contract to sell Dabbs' 1973 cotton crop to Estes and, in turn, to the plaintiff are valid and enforceable according to their express terms. Since specific performance has already been completed and effectuated pursuant to the preliminary injunction, no further relief need be rendered in favor of the plaintiff.

Judgment is granted in favor of the plaintiff for declaratory relief and in favor of the plaintiff and the defendant Estes, respectively, on the counterclaim and crossclaim of Dabbs.